UNITED STATES v. CANDELARIA ET AL.

ON CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 208.  Argued November 18, 19, 1925.—Decided June 1, 1926.

1. The Pueblo Indian tribes in New Mexico are dependent communities under the protective care of the United States, and their lands, though held by title in fee simple, are subject to the legislation of Congress enacted in the exercise of the Government's guardianship.  P. 439.

2. The purpose of Congress to subject the lands of these Indians to such legislation has been made certain in various ways, including an act annulling and forbidding taxation of lands by the Territory

of New Mexico and provision of a special attorney to represent the Pueblo Indians and protect their interests.  P. 440.

3. The Pueblos are "Indian tribes" within the meaning of Rev. Stats, § 2116, (adopted in 1834,) providing that "no purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution," and within the meaning of the Act of 1851, extending this provision, with others "regulating trade and intercourse with the Indian tribes," to "the Indian tribes" of New Mexico.  P. 441.

4. Under the Spanish and Mexican law, Pueblo Indians, although having full title to their lands, were regarded as in a state of tutelage and could alienate their lands only under governmental supervision.  P. 442.

5. Under territorial laws, sanctioned by Congress, a Pueblo community in New Mexico is a juristic person with capacity to sue and defend with respect to its lands.  P. 442.

6. But judgments against a Pueblo tribe in New Mexico, in suits brought by it to quiet title to its lands—one in a territorial court concluded in the state courts after statehood, the other in the federal court,—did not bar the United States from afterwards maintaining a suit to quiet the title to the same lands against the same defendants, on behalf of the Indians, where the United States was not a party to the former litigation and the attorney therein representing the Indians did so without the United States' authority.  P. 443.

7. A state court of New Mexico has jurisdiction to enter a judgment in an action by an Indian Pueblo against opposing claimants concerning title to land, which would be conclusive on the United States if it authorized the bringing and prosecution of the suit.  P. 444.

8. The question whether such a judgment disregarded an official survey of a Spanish or Mexican grant confirmed by Congress to the Indians, relates to the merits and not to the jurisdiction of the state court.  P. 444.

RESPONSE to questions certified by the Circuit Court of Appeals, upon an appeal from a decree of the District Court dismissing a bill brought by the United States to quiet the title to certain lands in the Indian Pueblo of Laguna.

9542°—26——28

*Mr. H. L. Underwood,* Special Assistant to the Attorney General, with whom *Solicitor General Mitchell* and *Assistant Attorney General Parmenter* were on the brief, for the United States.

The United States possesses the power to control the Pueblo Indians of New Mexico with respect to their lands. *United States* v. *Sandoval,* 231 U. S. 28.

What was decided in the *Santa Rosa Case,* 249 U. S. 110, was that that Pueblo had capacity to institute and maintain an action to protect its lands from unauthorized encroachments of executive officers. The action which the bill in that case asserted was threatened, was not an exercise of guardianship, but of confiscation. Cf. *United States* v. *Mille Lac Chippewas,* 229 U. S. 498.

The United States is suing to vindicate its policy with respect to the Indians and to discharge its obligations to them—a distinct governmental interest. As Congress owes the Pueblo Indians the duty of protection, and of safeguarding their rights, when it acts to discharge those obligations it proceeds in its own right and to vindicate its own policy. This interest is entirely distinct from any property interest of the Indians for whom it acts, and indeed a property or pecuniary interest in the United States is not a prerequisite to give it capacity to sue. *Heckman* v. *United States,* 224 U. S. 413. We submit that there is no greater need for protection of the Cherokees than there is for the Pueblo Indians of New Mexico, and that what was said in the *Heckman Case* is equally applicable to their situation. And the power of the Government to protect does not fall short of the need. *Sunderland* v. *United States,* 266 U. S. 226.

That the Pueblo of Laguna has fee simple title does not remove it from governmental supervision. *Brader* v. *James,* 246 U. S. 88; *United States* v. *Osage County,* 251 U. S. 128. It is enough if there be an interest or concern arising out of an obligation to those for whose benefit the

suits are brought.  *United States* v. *New Orleans Pac. Ry. Co.*, 248 U. S. 507; *Alaska Pacific Fisheries* v. *United States*, 248 U. S. 78; *Cramer* v. *United States*, 261 U. S. 219.

Since the United States was not a party to the previous suits brought by the Pueblo of Laguna, it can not be bound thereby, especially since the right which it seeks to vindicate is entirely distinct from the property rights of the Pueblo, the subject matter of the previous suits. *United States* v. *Moser*, 266 U. S. 236; *Bowling* v. *United States*, 233 U. S. 528; *Privett* v. *United States*, 256 U. S. 201; *Sunderland* v. *United States*, 266 U. S. 226.

The answer to Question I disposes of Question II, unless the latter be considered independently of the former. In that event, we concede that the state court did have jurisdiction to enter the judgment specified, but do not concede it to have a binding effect as to the United States.

*Mr. Frank W. Clancy* for defendants.

The former adjudications in the state court and in the United States District Court bar the present suit.  The real question here to be considered, is as to the right of the Pueblo of Laguna to bring a suit concerning its claimed ownership of land.  The answer to this is clearly given by the opinion in *Lane* v. *Santa Rosa*, 249 U. S. 110.  If the Pueblo has power to bring a suit it is absurd to say that the decision of that suit is a nullity if the United States is not a party, as is now contended by the Government.  If that were sound, a Pueblo, with its right to bring a suit, declared unmistakably by this Court, could gain nothing even if successful.  Clearly, if the Pueblo has power to sue, it must be bound by the result as must be its adversary.

It is clear that the subject-matter of the suits is the same and the relief sought is the same, which is to quiet title to the land in the Pueblo of Laguna.  It is now

argued that, while the Pueblo had a right to bring its suit, and its interest which entitled it to maintain the two previous suits was its property interest derived from the title by patent from the United States, yet the results of the previous suits cannot bar the United States in the present case because the interests of the United States and of the Pueblo are different and distinct, and there can be no privity between them. The distinction is difficult to understand; but it would seem that the contention is that the interest of the Pueblo which justified the bringing of its suits in its own name, was its claimed interest in the same land which is the subject matter of this, the third suit, while the interest of the United States is in the discharge of its assumed duty to protect the rights of the Pueblo of Laguna, and that this interest is different from the interest of the Pueblo. As applied to this case, this is a distinction without a difference, and is based upon the mere words by which counsel undertake to state their conception of the duty of the United States to the Indians, and upon nothing else. The conceded fact remains that the state court had jurisdiction to enter its judgment, but it is contended that the United States is not affected by the judgment and now must be allowed to re-litigate the same matters which were considered and passed upon by the state court acting within its undoubted jurisdiction. No case can be found to which can be better applied the doctrine of "*interest republicae ut sit finis litium.*"

The duty of the United States, if there is any, to the Pueblo of Laguna, is to protect the claimed right of the Pueblo to land in the Paguate Purchase, and its interest is as to the Pueblo's right to that land, which is identical with what was litigated by the Pueblo in the state court, within its jurisdiction.

As to the question of the binding effect of the former judgment on the right to prosecute the present case, there

are authorities which will be found interesting to say the least. *People* v. *Smith,* 93 Cal. 490; *People* v. *Beaudry,* 27 Pac. 610; *Foust* v. *Huntington,* 15 N. E. 337; *Lichty* v. *Lewis,* 63 Fed. 535; *Featherson* v. *Turnpike Co.,* 24 N. Y. S. 603; *Palmer* v. *Ins. Co.,* 30 N. Y. S. 1044; *Tausiede* v. *Jumel,* 30 N. E. 1000; *Carmody* v. *Hanick,* 85 Mo. App. 659; *M'Mullen* v. *Brown,* 2 Hill Ch. 457.

It is submitted that the interest of the Pueblo of Laguna and the interest of the United States in the subject matter of these suits, are identical, and the effort to distinguish between them, may properly, without discourtesy, be characterized as but little, if any, better than camouflage.

This court has decided that it has no jurisdiction of this controversy. *Pueblo of Laguna* v. *Candelaria,* 257 U. S. 623.

It being clearly established by the decision in *Lane* v. *Santa Rosa,* 249 U. S. 110, that the Pueblo has capacity to sue, an adverse decision is conclusive as to all matters adjudicated in such a suit or which might properly be adjudicated therein.

MR. JUSTICE VAN DEVANTER delivered the opinion of the Court.

In 1922 the United States brought a suit in the federal district court for New Mexico against José Candelaria and others to quiet in the Indian Pueblo of Laguna the title to certain lands alleged to belong to the pueblo in virtue of a grant from Spain, its recognition by Mexico and a confirmation and patent by the United States. The suit was brought on the theory that these Indians are wards of the United States and that it therefore has authority and is under a duty to protect them in the ownership and enjoyment of their lands. The defendants were alleged to be asserting a false claim to the lands and to be occupying

and fencing the same to the exclusion of the Indians.    In
their answer the defendants denied the wardship of the
United States and also set up in bar two decrees rendered
in prior suits brought against them by the pueblo to quiet
the title to the same lands.    One suit was described as
begun in 1910 in the territorial court and transferred when
New Mexico became a State to the succeeding state court,
where on final hearing a decree was given for the defend-
ants on the merits.    The other was described as brought
in 1916 in the federal district court and resulting in a
decree of dismissal on the grounds that the complaint
disclosed that the matters presented " were *res judicata*
and that there was no federal question in the case."    In
the replication the United States alleged that it was not
a party to either of the prior suits; that it neither author-
ized the bringing of them nor was represented by the
attorney who appeared for the pueblo; and therefore that
it was not bound by the decrees.

On the case thus presented the court held that the
decrees operated to bar the prosecution of the present suit
by the United States, and on that ground the bill was
dismissed.    An appeal was taken to the Circuit Court of
Appeals, which after outlining the case as just stated, has
certified to this Court the following questions:

1. Are Pueblo Indians in New Mexico in such status of
tutelage as to their lands in that State that the United
States, as such guardian, is not barred either by a judg-
ment in a suit involving title to such lands begun in the
territorial court and passing to judgment after statehood
or by a judgment in a similar action in the United States
District Court for the District of New Mexico, where, in
each of said actions, the United States was not a party
nor was the attorney representing such Indians therein
authorized so to do by the United States?

2. Did the state court of New Mexico have jurisdiction
to enter a judgment which would be *res judicata* as to

the United States, in an action between Pueblo Indians and opposed claimants concerning title to land, where the result of that judgment would be to disregard a survey made by the United States of a Spanish or Mexican grant pursuant to an act of Congress confirming such grant to said Pueblo Indians?

The status of the Pueblo Indians and their lands, and the relation of the United States to both, were considered in *United States* v. *Sandoval*, 231 U. S. 28. We there said (pp. 45–47):

" Not only does the Constitution expressly authorize Congress to regulate commerce with the Indian tribes, but long continued legislative and executive usage and an unbroken current of judicial decisions have attributed to the United States as a superior and civilized nation the power and the duty of exercising a fostering care and protection over all dependent Indian communities within its borders, whether within its original territory or territory subsequently acquired, and whether within or without the limits of a State. . . . ' It is for that body [Congress] and not for the courts, to determine when the true interests of the Indian require his release from such condition of tutelage.'

" Of course, it is not meant by this that Congress may bring a community or body of people within the range of this power by arbitrarily calling them an Indian tribe, but only that in respect of distinctly Indian communities the questions whether, to what extent, and for what time they shall be recognized and dealt with as dependent tribes requiring the guardianship and protection of the United States are to be determined by Congress and not by the courts.

" As before indicated, by an uniform course of action beginning as early as 1854 and continued up to the present time, the legislative and executive branches of the Government have regarded and treated the Pueblos of

New Mexico as dependent communities entitled to its aid and protection, like other Indian tribes, and, considering their Indian lineage, isolated and communal life, primitive customs and limited civilization, this assertion of guardianship over them cannot be said to be arbitrary but must be regarded as both authorized and controlling."

And also (p. 48): "We are not unmindful that in *United States* v. *Joseph*, 94 U. S. 614, there are some observations not in accord with what is here said of these Indians, but as that case did not turn upon the power of Congress over them or their property, but upon the interpretation and purpose of a statute not nearly so comprehensive as the legislation now before us, and as the observations there made respecting the Pueblos were evidently based upon statements in the opinion of the territorial court, then under review, which are at variance with other recognized sources of information, now available, and with the long continued action of the legislative and executive departments, that case cannot be regarded as holding that these Indians or their lands are beyond the range of Congressional power under the Constitution."

While we recognized in that case that the Indians of each pueblo, collectively as a community, have a fee simple title to the lands of the pueblo (other than such as are occupied under executive orders), we held that their lands, like the tribal lands of other Indians owned in fee under patents from the United States, are " subject to the legislation of Congress enacted in the exercise of the Government's guardianship " over Indian tribes and their property.

The purpose of Congress to subject the Pueblo Indians and their lands to that legislation, if not made certain before the decision in the *Joseph Case,* was made so in various ways thereafter. Two manifestations of it are significant. A decision of the territorial court in 1904 holding their lands taxable, 12 N. M. 139, was promptly

followed by a congressional enactment annulling the
taxes already levied and forbidding further levies, c. 1479,
33 Stat. 1069; and a decision of that court in 1907 con-
struing the statute which prohibits the sale of liquor to
Indians and its introduction into the Indian country as
not including these Indians or their lands, 14 N. M. 1,
was shortly followed by an enactment declaring that the
statute should be construed as including both, c. 310, 36
Stat. 560. It also is of significance that in 1898 Congress
provided for the employment by the Secretary of the
Interior of a special attorney to represent the Pueblo
Indians and protect their interests, c. 545, 30 Stat. 594,
and that from that time to this a special attorney has
been so employed and has been paid out of appropriations
made by Congress for the purpose, c. 42, 42 Stat. 1194.

Many provisions have been enacted by Congress—
some general and others special—to prevent the Govern-
ment's Indian wards from improvidently disposing of
their lands and becoming homeless public charges. One
of these provisions, now embodied in section 2116 of the
Revised Statutes, declares: " No purchase, grant, lease,
or other conveyance of lands, or of any title or claim
thereto from any Indian nation or tribe of Indians, shall
be of any validity in law or equity, unless the same be
made by treaty or convention entered into pursuant to
the Constitution." This provision was originally adopted
in 1834, c. 161, sec. 12, 4 Stat. 730, and, with others " reg-
ulating trade and intercourse with the Indian tribes,"
was extended over " the Indian tribes " of New Mexico in
1851, c. 14, sec. 7, 9 Stat. 587.

While there is no express reference in the provision to
Pueblo Indians, we think it must be taken as including
them. They are plainly within its spirit and, in our opin-
ion, fairly within its words, " any tribe of Indians." Al-
though sedentary, industrious and disposed to peace, they
are Indians in race, customs and domestic government,

always have lived in isolated communities, and are a simple, uninformed people, ill-prepared to cope with the intelligence and greed of other races. It therefore is difficult to believe that Congress in 1851 was not intending to protect them, but only the nomadic and savage Indians then living in New Mexico. A. more reasonable view is that the term " Indian tribe " was used in the acts of 1834 and 1851 in the sense of " a body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory." *Montoya* v. *United States,* 180 U. S. 261, 266. In that sense the term easily includes Pueblo Indians.

Under the Spanish law Pueblo Indians, although having full title to their lands, were regarded as in a state of tutelage and could alienate their lands only under governmental supervision. See *Chouteau* v. *Molony,* 16 How. 203, 237. Text writers have differed about the situation under the Mexican law; but in *United States* v. *Pico,* 5 Wall. 536, 540, this Court, speaking through Mr. Justice Field, who was specially informed on the subject, expressly recognized that under the laws of Mexico the government " extended a special guardianship " over Indian pueblos and that a conveyance of pueblo lands to be effective must be " under the supervision and with the approval " of designated authorities. And this was the ruling in *Sunol* v. *Hepburn,* 1 Cal. 254, 273, *et seq.* Thus it appears that Congress in imposing a restriction on the alienation of these lands, as we think it did, was but continuing a policy which prior governments had deemed essential to the protection of such Indians.

It was settled in *Lane* v. *Pueblo of Santa Rosa,* 249 U. S. 110, that under territorial laws enacted with congressional sanction each pueblo in New Mexico—meaning the Indians comprising the community—became a juristic person and enabled to sue and defend in respect of

its lands. But in that case there was no occasion and no attempt to determine whether or to what extent the United States would be bound by the outcome of such a litigation where it was not a party. That was a suit brought by the Pueblo of Santa Rosa to enjoin the Secretary of the Interior and the Commissioner of the General Land Office from carrying out what was alleged to be an unauthorized purpose and attempt to dispose of the Pueblo's lands as public lands of the United States. Arizona was formed from part of New Mexico and when in that way the pueblo came to be in the new territory it retained its juristic status. Beyond establishing that status and recognizing that the wardship of the Indians was not an obstacle to the suit the case is without bearing here. In the opinion it was said: "The Indians are not here seeking to establish any power or capacity in themselves to dispose of the lands, but only to prevent a threatened disposal by administrative officers in disregard of their full ownership. Of their capacity to maintain such a suit, we entertain no doubt. The existing wardship is not an obstacle, as is shown by repeated decisions of this Court, of which *Lone Wolf* v. *Hitchcock,* 187 U. S. 553 is an illustration."

With this explanation of the status of the Pueblo Indians and their lands, and of the relation of the United States to both, we come to answer the questions propounded in the certificate.

To the first question we answer that the United States is not barred. Our reasons will be stated. The Indians of the pueblo are wards of the United States and hold their lands subject to the restriction that the same cannot be alienated in any-wise without its consent. A judgment or decree which operates directly or indirectly to transfer the lands from the Indians, where the United States has not authorized or appeared in the suit, infringes that restriction. The United States has an inter-

est in maintaining and enforcing the restriction which cannot be affected by such a judgment or decree. This Court has said in dealing with a like situation: "It necessarily follows that, as a transfer of the allotted lands contrary to the inhibition of Congress would be a violation of the governmental rights of the United States arising from its obligation to a dependent people, no stipulations, contracts, or judgments rendered in suits to which the Government is a stranger, can affect its interest. The authority of the United States to enforce the restraint lawfully created cannot be impaired by any action without its consent." *Bowling and Miami Improvement Co.* v. *United States,* 233 U. S. 528, 534. And that ruling has been recognized and given effect in other cases. *Privett* v. *United States,* 256 U. S. 201, 204; *Sunderland* v. *United States,* 266 U. S. 226, 232.

But, as it appears that for many years the United States has employed and paid a special attorney to represent the Pueblo Indians and look after their interests, our answer is made with the qualification that, if the decree was rendered in a suit begun and prosecuted by the special attorney so employed and paid, we think the United States is as effectually concluded as if it were a party to the suit. *Souffront* v. *Compagnie des Sucreries,* 217 U. S. 475, 486; *Lovejoy* v. *Murray,* 3 Wall. 1, 18; *Claflin* v. *Fletcher,* 7 Fed. 851, 852; *Maloy* v. *Duden,* 86 Fed. 402, 404; *James* v. *Germania Iron Co.,* 107 Fed. 597, 613.

Coming to the second question, we eliminate so much of it as refers to a possible disregard of a survey made by the United States, for that would have no bearing on the court's jurisdiction or the binding effect of the judgment or decree, but would present only a question of whether error was committed in the course of exercising jurisdiction. With that eliminated, our answer to the question is that the state court had jurisdiction to entertain the suit and proceed to judgment or decree. Whether the

outcome would be conclusive on the United States is
sufficiently shown by our answer to the first question.

*Questions answered as stated in this opinion.*